# IN THE COURT OF APPEALS OF IOWA

No. 17-0641
Filed August 15, 2018

**IN RE THE DETENTION OF CORY BLAKE WEST,**

**CORY BLAKE WEST,**
      Respondent-Appellant.
_____

Appeal from the Iowa District Court for Wapello County, Shawn R. Showers, Judge.

Cory West appeals from the jury verdict finding that his mental abnormality has not changed such that he is suitable for discharge from civil commitment as a sexually violent predator. **AFFIRMED.**

Jason Dunn of State Public Defender's Office, Sioux City, for appellant.

Thomas J. Miller, Attorney General, and Timothy M. Hau, Assistant Attorney General, for appellee State.

Considered by Danilson, C.J., Vogel, J., and Scott, S.J.*

*Senior judge assigned by order pursuant to Iowa Code section 602.9206 (2018).

**DANILSON, Chief Judge.**

Cory West appeals from the jury verdict finding that his mental abnormality has not changed such that he is suitable for discharge from civil commitment as a sexually violent predator. Because there is substantial evidence from which the jury could find West was not suitable for discharge from civil commitment, we affirm.

On September 1, 2011, a jury found West was a sexually violent predator (SVP) as defined by Iowa Code chapter 229A.[1] *In re Det. of West*, No. 11-1545, 2013 WL 988815, at *1 (Iowa Ct. App. Mar. 13, 2013) (affirming SVP finding). Pursuant to that finding, West was confined at the Civil Commitment Unit for Sex Offenders (CCUSO).

West progressed through the CCUSO programming and moved to transitional release in 2013,[2] working at a food processing plant. In the summer of 2014, West was harassed at work. Several days later, he cut off his ankle monitor, purchased a plane ticket, and flew to Oklahoma. Once there, he checked

---

[1] Iowa's civil commitment statute defines a SVP as a person who has been convicted of or charged with a sexually violent offense and suffers from a "mental abnormality" that makes the person "likely to engage in predatory acts of sexual violence" if not confined in a secure facility. Iowa Code § 229A.2(5) (2015) (defining "likely to engage in predatory acts of sexual violence"), (12) (defining "sexually violent predator"). The statute defines a "mental abnormality" as "a congenital or acquired condition affecting the emotional or volitional capacity of a person and predisposing that person to commit sexually violent offenses to a degree which would constitute a menace to the health and safety of others." *Id.* § 229A.2(6).

[2] "Transitional release is a treatment phase in which the committed person 'is gradually given increasing opportunities to live in less restrictive settings. The patient is monitored closely, assessed clinically, and provided support as the patient takes on increasing responsibility for the patient's own care.'" *Taft v. Iowa Dist. Ct. ex rel Linn Cty.*, 828 N.W.2d 309, 322 (Iowa 2013) (citation omitted).

into a hotel. He registered as a sex offender and was arrested four days later. Upon his return to Iowa, West restarted the CCUSO programming.

In July 2016, West was identified as a person who might benefit from counseling with a trauma group conducted by psychologist, Dr. Jane Daniel. During group counseling, West reported he was having night terrors related to the 2014 harassment:

> What he reported to me was that . . . in 2014 in the summer, . . . he was assaulted in his place of employment by a coworker, slash, supervisor type person. And the person attempted or threatened sexual assault in the shower, and then threatened physical assault with a knife immediately following that.

In August, West also began individual counseling with Dr. Daniel, with whom he met eighteen times over the next several months.

At the CCUSO, West reached Phase IV, Level 5, the highest level of privileges prior to transitional release. He has remained at that level for eighteen months and seeks discharge.

On December 5, 2016, an annual-review hearing was held.[3] The district court "acknowledged [receipt of] the November 28th annual report of Dr. Richard B. Krueger, which counsel agree is relevant and reliable evidence to rebut the

---

[3] At an annual review,

> The burden is on the committed person to prove by a preponderance of the evidence that there is relevant and reliable evidence to rebut the presumption of continued commitment, which would lead a reasonable person to believe a final hearing, should be held to determine either of the following:
>> (a) The mental abnormality of the committed person has so changed that the person is not likely to engage in predatory acts constituting sexually violent offenses if discharged.
>> (b) The committed person is suitable for placement in a transitional release program pursuant to section 229A.8A.

Iowa Code § 229A.8(5)(e)(1). *See Taft*, 828 N.W.2d at 318 (discussing burden under recently amended provision).

presumption of continued commitment such that it would lead a reasonable person to believe a final hearing should be held." The district court scheduled a final hearing on West's request for discharge.

A jury trial was held on March 21-23, 2017. Dr. Anna Salter, the State's expert witness, testified she believed West continued to suffer from a mental abnormality that made him more likely than not to engage in another sexually predatory act. Dr. Salter consulted West's permanent file, his CCUSO notes, and his records. She also interviewed him and scored him with the Static-99R actuarial instrument. Dr. Salter stated West was diagnosed with a paraphilic disorder not otherwise specified (NOS), arousal to non-consenting partners. In Dr. Salter's interview with West, West acknowledged a past practice of "taking advantage of women" and "choosing to have nonconsensual sex." He acknowledged deriving enjoyment from "being able to manipulate [women] into something I wanted them to do, which was still nonconsensual." Dr. Salter found these statements were consistent with his prior diagnosis of paraphilia NOS—non-consent.

Dr. Salter opined West remained more likely than not to commit another sexual offense if released. Dr. Salter scored West a four on the Static-99R. Using "high risk" actuarial norms, she found West was a member of a group of which 27.3 percent were caught for a new offense within the first ten years of release, or almost twice as likely to reoffend and be caught as the average sex offender. She testified that though the Static-99R was a valuable and widely-used tool, it was incomplete as it only provided a statistical likelihood of re-offense and *arrest*. She noted rapes and sexual assaults are underreported. Moreover, Dr. Salter observed the Static-99R provides statistical analysis for five and ten-year sample

sizes and does not assess an individual's lifetime chances for offense as Iowa Code section 229A.2(5) inquires. In addition, because the Static-99R examines "static" factors of an individual's makeup, the instrument does not examine "dynamic" factors such as changes in an individual through therapy and conditioning. Thus, Dr. Salter also evaluated a number of dynamic factors to assess West's likelihood of re-offense—including sexualized violence, manipulation, grievance and hostility, a lack of emotionally intimate relationships, a lack of concern for others, poor problem solving, and dysfunctional coping—all of which indicated to Dr. Salter that West was more likely than not to commit further acts of sexual violence.

Dr. Salter also noted recent incidents suggested West's preoccupation with manipulation continued. In mid-2015, West had reached out to the Centers Against Abuse and Sexual Assault (CAASA) requesting services and materials for dealing with trauma following his harassment at the food plant. Within the year prior to trial, West repeatedly contacted a woman who worked with the CAASA. Although the woman stated CAASA could not provide direct services to West, Aaron Blood (West's therapist) did request materials on West's behalf. Thereafter, West personally requested additional materials intended for male victims from the woman at CAASA. He made multiple telephone calls a week to her, left voicemails, and sent thank you cards. He proposed that she come to CCUSO to give a presentation on CAASA's services, remarking that he was "on the CCUSO committee and they would like to highlight CAASA's agency in order to give back." In pursuing the visit, West commented that some sexual abusers were themselves victimized at one time or another. The woman was unclear what sort of

presentation West was seeking, and indicated that even if she were to make a presentation, she would need to bring someone along. The next day she received a thank-you card from West and a visitation application for the proposed presentation. The card read, "[Blood] asked me to send this to you and that he also provided an additional form for another person to come." The woman telephoned Blood about excessive contacts from West. Blood informed her he had not requested a presentation; rather, West had informed Blood that CAASA wanted to come to CCUSO and speak to the inmates about their services. Blood asked the woman to write a letter, which she did. West was told not to contact her again. Dr. Salter also observed that a person identifying herself as a realtor had called CCUSO and asked that West not be allowed to call her anymore. CCUSO personnel had not kept a good record of this contact and the call could not be confirmed.

West testified about his ten months in transitional release. He acknowledged developing and maintaining a relationship with a woman during that time despite being told by his treatment team to no longer have any contact with her. He testified about his coworker who harassed him, assaulted him in the shower, threatened to rape him, and pulled a knife on him. West stated he did not report the threat or the knife incident at work but gave a CCUSO program supervisor "a brief overview" of what had occurred, and West was told, "Well, just deal with it then." West absconded about a week later. He purchased a plane ticket on Saturday. On Sunday, West lied about having to work and left CCUSO, cut off his GPS tracking unit, drove his car to work, where he was met by a cab he had ordered, and was taken to the airport. When he arrived in Oklahoma, he called

an Iowa police department (which was neither in the county where he worked or where CCUSO was) and reported "what had happened to me." West described his treatment plan upon his return to CCUSO programming. He discussed the "dynamic risk factors" (or "things that you can actually change") he was working on explaining, "I've been looking at in the last year and a half, two years, is being able to redevelop a lot of the structure that I didn't have whenever I was offending and being able to manage that structure on a day-to-day basis."

Dr. Kreuger testified for West. He first opined that West did not suffer from a mental abnormality, and instead only made a diagnosis of "alcohol abuse in sustained remission in a controlled environment." In Dr. Kreuger's view, a diagnosis of paraphilia NOS, non-consent, would require the individual to engage in multiple physically coercive rapes, equating the requisite conduct with sexual sadism. Based upon this definition, Dr. Kreuger found West "did not fit that criteria." He noted West had "a sort of unusual, screwy way of, sort of, trying to meet women, meet individuals, but the essence of the matter where one is forcing or coercing somebody was not present basically, so I don't think that he meets the criteria" of paraphilia NOS, non-consent. Dr. Krueger also stated that he believed West's chances of re-offense were "remote." While he, too, scored West a four on the Static-99R, he relied upon the "regular" norming tables, rather than the "high risk" tables Dr. Salter used. Nor did Dr. Kreuger consult the updated coding rules released in 2016. He also ran West through a battery of other assessment instruments, some of which were outdated and not recommended in current practice. Dr. Krueger opined West was not more likely than not to commit future acts of predatory violence.

The jury was instructed as follows:

Instruction No. 9

In order to prove [West] is not suitable for discharge from civil commitment, the State must prove that [West]'s mental abnormality remains such that he is likely to engage in predatory acts that constitute sexually violent offenses if he is discharged.

Instruction No. 10

As used in these Instructions, the term "mental abnormality" means a congenital or acquired condition affecting the emotional or volitional capacity and predisposing the person to commit sexually violent offenses to a degree that causes the person serious difficulty in controlling his behavior.

You are instructed that at the time of his commitment in 2011, [West] was determined to be suffering from at least one mental abnormality.

Instruction No. 11

As used in these Instructions, the term "predatory acts" means engagement or dealings with another person which is primarily aimed at victimizing the person in a sexual manner.

Instruction No. 12

As used in these Instructions, the term "likely to engage in predatory acts constituting sexually violent offenses" means that the person more likely than not will engage in acts constituting sexually violent offenses. The word "likely" means that a proposition is more probably true than not.

You are instructed that at the time of [West]'s commitment in 2011, it was determined that he was likely to engage in predatory acts constituting sexually violent offenses if not confined in a secure facility.

The jury returned a verdict finding West's mental abnormality had not changed such that he is suitable for discharge from civil commitment. The trial court denied West's motions for directed verdict, judgment notwithstanding the verdict, and new trial.

West appeals, arguing there is insufficient evidence that he continues to suffer a mental abnormality and that he is more likely than not to commit future acts of sexual violence.

We review West's challenge to the sufficiency of the evidence for the correction of errors at law. *See In re Det. of Betsworth*, 711 N.W.2d 280, 286 (Iowa 2006). We will affirm the jury's finding if it is supported by substantial evidence. *See id.* In determining whether substantial evidence supports the finding, we consider the evidence in the light most favorable to the State, including all legitimate inferences and presumptions that may be fairly and reasonably deduced from the record. *See id.* Evidence that raises only suspicion, speculation, or conjecture is insufficient. *See id.*

At a final hearing, it is the State's burden to prove beyond a reasonable doubt "either of the following: (1) The committed person's mental abnormality remains such that the person is likely to engage in predatory acts that constitute sexually violent offenses if discharged. (2) The committed person is not suitable for placement in a transitional release program pursuant to section 229A.8A."[4] Iowa Code § 229A.8(6)(d).

---

[4] Section 229A.8A(2) provides in part:

A committed person is suitable for placement in the transitional release program if the court finds that all of the following apply:

(a) The committed person's mental abnormality is no longer such that the person is a high risk to reoffend.

(b) The committed person has achieved and demonstrated significant insights into the person's sex offending cycle.

(c) The committed person has accepted responsibility for past behavior and understands the impact sexually violent crimes have upon a victim.

(d) A detailed relapse prevention plan has been developed and accepted by the treatment provider which is appropriate for the committed person's mental abnormality and sex offending history.

(e) No major discipline reports have been issued for the committed person for a period of six months.

(f) The committed person is not likely to escape or attempt to escape custody pursuant to section 229A.5B.

(g) The committed person is not likely to engage in predatory acts constituting sexually violent offenses while in the program.

The jury was presented opposing expert witness opinions. Determining witness credibility and weighing evidence is the job of the factfinder. *See In re Det. of Barnes*, 689 N.W.2d 455, 461 (Iowa 2004). In doing so, the jury was free to reject the testimony of Dr. Kreuger and accept the testimony of Dr. Salter. *See In re Det. of Hennings*, 744 N.W.2d 333, 340 (Iowa 2008) ("The jury was free to reject the testimony of Hennings's expert witnesses and to instead accept the testimony of [the State's expert witness]."). In reaching its conclusion, the jury was entitled to consider the entire testimony of the experts including their credentials. Our review of the record reveals substantial evidence from which the jury could find beyond a reasonable doubt that West remains subject to confinement as a SVP. Finding no basis for reversal, we affirm.

**AFFIRMED.**

---

(h) The placement is in the best interest of the committed person.
(i) The committed person has demonstrated a willingness to agree to and abide by all rules of the program.